UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JAN 07 2016

| UNITED STATES OF AMERICA | § | |
| --- | --- | --- |
| | § | |
| v. | § | CRIMINAL NO. |
| | § | |
| MOISES ABRAHAM MILLAN ESCOBAR | § § | UNDER SEAL  **16 CR 009** |

### INFORMATION

**Sealed**
Public and unofficial staff access to this instrument are prohibited by court order.

THE UNITED STATES CHARGES:

### Introduction

At all times material to this information:

1. Petroleos de Venezuela S.A. ("PDVSA") was the Venezuelan state-owned and state-controlled oil company. PDVSA and its subsidiaries were responsible for the exploration, production, refining, transportation, and trade in energy resources in Venezuela and provided funding for other operations of the Venezuelan government. Bariven S.A. ("Bariven") was the PDVSA procurement subsidiary responsible for equipment purchases. PDVSA and its wholly owned subsidiaries, including Bariven, were "instrumentalities" of the Venezuelan government as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2(h)(2)(A). PDVSA officers and employees were "foreign officials" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

2. "BUSINESSMAN 1," an individual whose identity is known to the United States, was a U.S. lawful permanent resident and a resident of Texas, and was the owner of a number of U.S.-based energy companies, including several companies based in the Southern District of Texas, that supplied equipment and services to PDVSA, and thus was a "domestic concern" and an officer, director, employee, agent, and shareholder of a "domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

3. "BUSINESSMAN 2," an individual whose identity is known to the United States, was the owner of a number of U.S.-and Venezuelan-based energy companies that supplied equipment and services to PDVSA, and a resident of the United States, and thus a "domestic concern" and an officer, director, employee, agent, and shareholder of a "domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).  BUSINESSMAN 1 and BUSINESSMAN 2 worked together on a number of PDVSA contracts and contract bids.

4. Defendant **MOISES ABRAHAM MILLAN ESCOBAR** ("Defendant **MILLAN**"), a resident of Venezuela and Fort Bend County, Texas, was employed by, or worked as an independent contractor for BUSINESSMAN 2. Defendant **MILLAN** acted as an agent of BUSINESSMAN 1's and BUSINESSMAN 2's companies, including their U.S.-based companies, and was

2

thus an agent of a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

5. "Official A," an individual whose identity is known to the United States, was at all relevant times employed by PDVSA or a wholly owned subsidiary thereof, including as a buyer at Bariven and a supervisor of other Bariven buyers. Official A's job responsibilities included assigning bidding panels to buyers within Official A's group, including Official C and Official D, who would then be responsible for selecting companies for the bidding panels, which allowed those companies to submit bids on individual PDVSA projects. Official A was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

6. "Official B," an individual whose identity is known to the United States, was at all relevant times employed by PDVSA or a wholly owned subsidiary thereof, including as a purchasing analyst for Bariven. Official B's job responsibilities included selecting companies for bidding panels, which allowed those companies to submit bids on individual PDVSA projects. Official B was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

7. "Official C," an individual whose identity is known to the United States, was at all relevant times employed by PDVSA or a wholly owned

3

subsidiary thereof, including as a purchasing manager and superintendent of purchasing at Bariven. Official C's job responsibilities included selecting companies for bidding panels, which allowed those companies to submit bids on individual PDVSA projects and the ability to select winning companies for the economic portion of the bid process. Official C was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

8. "Official D," an individual whose identity is known to the United States, was at all relevant times employed by PDVSA or a wholly owned subsidiary thereof, including as a buyer for Bariven. Official D's job responsibilities included selecting companies for bidding panels, which allowed those companies to submit bids on individual PDVSA projects. Official D was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

9. Beginning in at least 2009 and continuing through at least 2012, the defendant,

**MOISES ABRAHAM MILLAN ESCOBAR,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly conspire, confederate, and agree with BUSINESSMAN 1, BUSINESSMAN 2, and others known and unknown, to commit offenses against

4

the United States, that is: being an agent of a domestic concern, and together with a domestic concern, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist BUSINESSMAN 1, BUSINESSMAN 2, their companies, and others in obtaining and retaining business for and with, and directing business to, BUSINESSMAN 1's and BUSINESSMAN 2's companies, in violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2(a).

## Purpose of the Conspiracy

10. The purpose of the conspiracy was for Defendant **MILLAN**, BUSINESSMAN 1, BUSINESSMAN 2, and their co-conspirators to make corrupt bribe payments to PDVSA officials, including, but not limited to, Official A, Official B, Official C, and Official D, so that BUSINESSMAN 1, BUSINESSMAN 2, and their cohorts would gain an improper advantage in obtaining and retaining lucrative energy contracts with PDVSA.

## Manner and Means of the Conspiracy

11. The manner and means by which Defendant **MILLAN** and his co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

12. In order to obtain and retain business for and on behalf of BUSINESSMAN 1's and BUSINESSMAN 2's companies, Defendant **MILLAN**, together with others, including BUSINESSMAN 1 and BUSINESSMAN 2, would and did discuss:

    a. the need to provide things of value to PDVSA officials;

    b. the identity of the PDVSA officials whom they would target;

    c. the particular things of value to provide to those officials; and

    d. the manner and means by which things of value would be provided.

13. Defendant **MILLAN**, together with others, including BUSINESSMAN 1 and BUSINESSMAN 2, would and did provide to PDVSA officials things of value, including recreational travel, meals, and entertainment, in order to obtain and retain business on behalf of BUSINESSMAN 1's and BUSINESSMAN 2's companies.

14. Defendant **MILLAN**, together with others, including BUSINESSMAN 1 and BUSINESSMAN 2, would and did solicit and agree with PDVSA officials, on behalf of BUSINESSMAN 1's and BUSINESSMAN 2's companies, that those companies would pay bribes based on a percentage of any contracts they helped to award to BUSINESSMAN 1's and BUSINESSMAN 2's companies, including BUSINESSMAN 1's and BUSINESSMAN 2's U.S.-based companies.

15. Defendant **MILLAN**, together with others, including BUSINESSMAN 1 and BUSINESSMAN 2 would and did provide to PDVSA officials who were receiving bribes bidding panel lists that would include more than one company owned by BUSINESSMAN 1 and/or BUSINESSMAN 2, and would relay to the PDVSA officials which company to select as the winning bidder.

16. Defendant **MILLAN**, together with others, including BUSINESSMAN 1 and BUSINESSMAN 2, would and did keep track of the

amounts owed to each PDVSA official based on the contracts that the PDVSA official had helped to award to one or more of BUSINESSMAN 1's and/or BUSINESSMAN 2's companies.

17. Defendant **MILLAN**, together with others, including BUSINESSMAN 1 and BUSINESSMAN 2, would and did attempt to conceal the bribery scheme by creating and using private email accounts to communicate about the scheme.

### Overt Acts

18. In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed or caused to be committed, in the Southern District of Texas and elsewhere, at least one of the following overt acts, among others:

19. In or around 2010, Defendant **MILLAN** helped Official B to open a bank account in Panama in order to receive bribe payments outside Venezuela, and into which BUSINESSMAN 1 and BUSINESSMAN 2 subsequently paid bribes.

20. On or about April 9, 2010, BUSINESSMAN 1 caused $100,000 to be transferred from a bank account in the United States in the name of a company owned by BUSINESSMAN 1 to Official B's bank account in Panama in connection with a PDVSA contract awarded to a company owned by BUSINESSMAN 1.

21. On or about June 23, 2010, BUSINESSMAN 2 caused $100,000 to be transferred from a bank account in the name of a company owned by BUSINESSMAN 2 to Official C's bank account in the Southern District of Texas in exchange for Official C's assistance in awarding PDVSA contracts to companies owned by BUSINESSMAN 2.

22. On or about September 23, 2010, BUSINESSMAN 1 caused $100,000 to be transferred from a bank account in the name of a company owned by BUSINESSMAN 1 to Official C's bank account in the Southern District of Texas in exchange for Official C's assistance in awarding PDVSA contracts to companies owned by BUSINESSMAN 1.

23. On or about October 27, 2011 Defendant **MILLAN** sent an email to BUSINESSMAN 2 with the subject line "Pendiente de la [Official A]," which translates to "Pending [Official A]," attaching an Excel spreadsheet listing numerous PDVSA contracts that had been awarded to BUSINESSMAN 2's companies between September 1, 2010 to September 30, 2011 by various Bariven buyers that were supervised by Official A, and listing a "Comision Pendiente," or "Pending Commission," of $188,276.61 USD. These "commissions" represented bribes to be paid to Official A.

24. On or about December 6, 2011, an associate of BUSINESSMAN 2 sent an email to Defendant **MILLAN** in which he forwarded a $14,502.29 hotel

reservation for Official D at the Fontainebleau Hotel in Miami Beach, Florida, the cost of which was to be covered by one of BUSINESSMAN 2's companies.

25. On or about January 26, 2012, Defendant **MILLAN** sent an email to BUSINESSMAN 2 and other associates of BUSINESSMAN 2 whereby Defendant **MILLAN** arranged for one of BUSINESSMAN 2's companies to cover the cost of a hotel and rental car in Barcelona, Venezuela for Official D.

26. On or about January 28, 2012, BUSINESSMAN 2 responded to the email referenced in Paragraph 25 and instructed Defendant **MILLAN** to arrange for the costs of Official D's travel to be handled "fuera de la contabilidad," which translates to "outside of accounting."

27. On or about April 24, 2012, BUSINESSMAN 2 sent an email to Official A, BUSINESSMAN 1, and Defendant **MILLAN** instructing Official A to "assign" a particular PDVSA contract to Official D for the assembly of the bid panel and informing Official A which of BUSINESSMAN 2's companies "will win" the project.

All in violation of Title 18, United States Code, Section 371.

### Forfeiture Allegation

28. As a result of committing one or more of the offenses charged in Counts 1 of this Information, the defendant, **MOISES ABRAHAM MILLAN ESCOBAR**, shall forfeit to the United States, pursuant to Title 18, United States

Code, 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of these offenses, and all property traceable to such property.

## Substitute Asset Provision

29.    If any of the above-described forfeitable property in Paragraph 28, as a result of any act or omission of Defendant **MILLAN**,

   a. Cannot be located upon the exercise of due diligence;

   b. Has been transferred or sold to, or deposited with, a third person;

   c. Has been placed beyond the jurisdiction of the Court;

   d. Has been substantially diminished in value; or

   e. Has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of Defendant **MILLAN** up to the value of the forfeitable property described above.

KENNETH MAGIDSON
UNITED STATES ATTORNEY

ANDREW WEISSMANN
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
DEPARTMENT OF JUSTICE

BY: *John Pearson* (signature)
JOHN P. PEARSON
DEPUTY CHIEF
ROBERT S. JOHNSON
ASSISTANT UNITED STATES ATTORNEY

BY: /s/
AISLING O'SHEA
JEREMY R. SANDERS
TRIAL ATTORNEYS

12